COURT OF APPEALS OF VIRGINIA


Present:   Chief Judge Felton, Judge Elder and Senior Judge Willis
Argued at Chesapeake, Virginia


WILLIAM D. BREIT

v.      Record No. 0337-11-1

BEVERLEY MASON AND L.F., A MINOR[*]

OPINION BY
CHIEF JUDGE WALTER S. FELTON, JR.
DECEMBER 28, 2011


FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
Theodore J. Markow, Judge Designate

Kevin E. Martingayle (William D. Breit; Serious Injury Law Center,
PLLC, on briefs), for appellant.

Reeves W. Mahoney (Andrew T. Richmond; Huff, Poole &
Mahoney, P.C., on brief), for appellee Beverley Mason.

Jerrold G. Weinberg, Guardian *ad litem* for the minor child
(Weinberg & Stein, on brief), for appellee L.F.


William Breit ("Breit") appeals the order of the Circuit Court for the City of Virginia

Beach ("trial court") sustaining Beverley Mason's ("mother") and L.F.'s ("child") pleas in bar to

Breit's petition to determine parentage of L.F.  Breit contends the trial court erred in holding that

he is barred from asserting that he is the legal father of L.F.  L.F. was conceived as a result of

assisted conception.  Mother, the biological and gestational mother, and Breit, the sperm donor

and biological father, never married.

Breit also contends the trial court erred in appointing counsel hired by mother to act as

the child's guardian *ad litem*, and erred in failing to award his attorney's fees at trial.  For the

---

[*] In the trial court the style of the case reflected the full name of L.F., a minor, and named
her as the first party in interest to the action.  We have amended the name of the case on appeal
to protect L.F.'s identity.

following reasons, we affirm in part, reverse in part, and remand to the trial court for further proceedings.[1]

## I. BACKGROUND

"A plea in bar asserts a single issue, which, if proved, creates a bar to a plaintiff's recovery." Hawthorne v. VanMarter, 279 Va. 566, 577, 692 S.E.2d 226, 233 (2010). "[W]here no evidence is taken in support of a plea in bar, the trial court, and the appellate court upon review, consider solely the pleadings in resolving the issue presented. In doing so, the facts stated in the plaintiff's [petition] are deemed true." Lostrangio v. Laingford, 261 Va. 495, 497, 544 S.E.2d 357, 358 (2001). However, "[i]f the parties present evidence on the plea *ore tenus*, the [trial] court's factual findings are accorded the weight of a jury finding and will not be disturbed on appeal unless they are plainly wrong or without evidentiary support." Hawthorne, 279 Va. at 577, 692 S.E.2d at 233. So viewed, the following facts are undisputed.

Mother and Breit were in a long-term romantic relationship and lived together as an unmarried couple. Mother desired to have a child, and during the course of their relationship mother and Breit engaged in sexual intercourse for the purpose of conceiving a child.[2] Their

---

[1] Breit also challenges the ruling of the trial court on constitutional equal protection and due process grounds. Because we conclude the trial court erred in its application of Code §§ 20-156 to -165 and 20-49.1(B)(2), we do not reach the constitutional issue. See, e.g., Luginbyhl v. Commonwealth, 48 Va. App. 58, 64, 628 S.E.2d 74, 77 (2006) (*en banc*) ("[A]n appellate court decides cases 'on the best and narrowest ground available.'" (quoting Air Courier Conference v. Am. Postal Workers Union, 498 U.S. 517, 531 (1991) (Stevens, J., concurring))). In light of our holding that the trial court erred in sustaining mother's and L.F.'s pleas in bar to Breit's Petition to Determine Parentage, we need not address mother's assignment of cross-error that the trial court failed to send a certified copy of its final order to the State Registrar of Vital Records, pursuant to Code § 20-49.8(C). See id. Likewise, we do not address Breit's contention that the trial court erred in failing to grant summary judgment in in his favor, pursuant to Code § 20-49.1(B)(2). See id.

[2] Mother did not have any children. Breit had three children from a previous marriage.

efforts to conceive a child through sexual intercourse were unsuccessful. In April 2008, mother and Breit sought reproductive assistance from Dr. Jill T. Flood, a board-certified physician in obstetrics, gynecology, and reproductive endocrinology. Dr. Flood interviewed mother and Breit and collected their medical, social, and family histories.[3] Dr. Flood counseled mother and Breit about various fertility treatment options, costs, and risks of treatment, and collected blood and semen specimens from Breit to aid in the *in vitro* fertilization of mother's ova.[4] In June 2008, Dr. Flood retrieved eggs from mother's ovaries, fertilized those eggs outside mother's body using the sperm donated by Breit, and transferred the resulting embryos into mother's uterus. The June 2008 transfer was unsuccessful, and mother did not become pregnant. Dr. Flood repeated the transfer process in October 2008, again using sperm donated by Breit. Breit was present for both rounds of egg retrieval, fertilization, and transfer of the embryos into mother's uterus. The second transfer was successful, and Dr. Flood confirmed in October 2008 that mother was pregnant. Mother and Breit continued to cohabitate throughout mother's pregnancy.

---

[3] Dr. Flood testified that she prepares consent forms when a woman's eggs are fertilized with sperm from a sperm donor, whether that donor is known or anonymous. She testified she uses consent forms when donor sperm is utilized because "when you are using a donor the donor needs to have anonymity if they so choose, and if they are not anonymous, if they are known, we believe that they should have some kind of contractual idea about what their role in the participation of developing the child is." Dr. Flood testified she did not prepare donor consent forms for mother and Breit and treated them as she would have treated a married couple.

[4] The Code of Virginia does not define "*in vitro* fertilization." Code § 20-156 defines "assisted conception" as

> a pregnancy resulting from any intervening medical technology,
> whether *in vivo* or *in vitro*, which completely or partially replaces
> sexual intercourse as the means of conception. Such intervening
> medical technology includes, but is not limited to . . . artificial
> insemination by donor, cryopreservation of gametes and embryos,
> *in vitro* fertilization, uterine embryo lavage, embryo transfer,
> gamete intrafallopian tube transfer, and low tubal ovum transfer.

On June 8, 2009, prior to the child's birth, mother and Breit entered into a written Custody and Visitation Agreement, prepared by mother's attorney, providing that Breit would have reasonable visitation with the child and that such visitation would serve the best interests of the child. On July 13, 2009, mother gave birth to L.F. The following day, July 14, 2009, mother and Breit executed a sworn, written "Acknowledgment of Paternity," naming Breit as the biological and legal father of the child.[5] Mother and Breit agreed to give L.F. a hyphenated surname comprised of mother's and Breit's surnames. Mother and Breit were named as L.F.'s mother and father on L.F.'s birth certificate, pursuant to Code § 32.1-257(D),[6] and they jointly mailed birth announcements to friends and family naming mother and Breit as L.F.'s parents. Mother and Breit continued to cohabitate for months after L.F.'s birth and represented to friends and family that Breit was L.F.'s legal and biological father. Breit maintained L.F. on his health insurance, cared for L.F., and established a relationship with her.[7]

In August 2010, when L.F. was just over one year old, mother unilaterally terminated all contact between L.F. and Breit. On August 24, 2010, Breit filed a petition for custody and

---

[5] Breit and mother used the Acknowledgment of Paternity form promulgated by the Virginia Department of Health, Division of Vital Records, pursuant to Code § 32.1-257(D).

[6] Code § 32.1-257(D) provides, in pertinent part:

> If the mother of a child is not married to the natural father of the child at the time of birth or was not married to the natural father at any time during the ten months next preceding such birth, the name of the father shall not be entered on the certificate of birth *without a sworn acknowledgment of paternity, executed subsequent to the birth of the child, of both the mother and of the person to be named as the father*.

(Emphasis added).

[7] Breit's parents, L.F.'s grandparents, also had a relationship with L.F. and represented to friends and family that she was their granddaughter.

visitation in the Virginia Beach Juvenile and Domestic Relations District Court ("JDR district court"). Mother filed a motion to dismiss, asserting that, pursuant to Code §§ 20-158(A)(3) and 32.1-257(D), notwithstanding the voluntary Acknowledgment of Paternity executed by the parties under oath, and notwithstanding that mother and Breit signed the application for L.F.'s birth certificate, Breit was not the legal father of L.F. Mother asserted that Code § 20-158(A)(3) provided, in pertinent part, that "[a] donor is not the parent of a child conceived through assisted conception, unless the donor is the husband of the gestational mother" and that Code § 32.1-257(D) provided, in pertinent part, that "[d]onors of sperm or ova shall not have any parental rights or duties for any . . . child [conceived as a result of assisted conception]."

On October 28, 2010, "in the interest of judicial expediency," the JDR district court dismissed, without prejudice, Breit's petition for custody and visitation. On November 1, 2010, Breit appealed the dismissal of the JDR district court to the trial court. On November 15, 2010, pursuant to Code § 20-49.2, Breit filed a Petition to Determine Parentage and Establish Custody and Visitation ("Petition to Determine Parentage") in the trial court, naming mother and L.F. as co-party defendants.[8] Breit asserted that the Acknowledgment of Paternity that he and mother

---

[8] Code § 20-49.2 provides, in pertinent part:

> Proceedings under this chapter may be instituted upon petition, verified by oath or affirmation, filed by a child, a parent, [or] a person claiming parentage . . . .

> \* \* \* \* \* \* \*

> The circuit courts shall have concurrent original jurisdiction of cases arising under this chapter with the juvenile and domestic relations district courts *when the parentage of a child is at issue in any matter otherwise before the circuit court*. The determination of parentage, when raised in any proceeding, shall be governed by this chapter.

- 5 -

executed on July 14, 2009, the day after mother gave birth to L.F., "creat[ed] a final and binding [p]arent and [c]hild relationship between [Breit] and [L.F.]."[9]  He also filed a Notice and Motion for Entry of Summary Judgment Order ("Motion for Summary Judgment") and various procedural motions associated therewith.[10]  On December 6, 2010, the trial court entered an order consolidating the appeal from the JDR district court with Breit's Petition to Determine Parentage.

On December 13, 2010, L.F., the infant at issue, by her attorney Jerrold Weinberg, filed a Plea in Bar to Breit's Petition to Determine Parentage.[11]  Mother filed a Plea in Bar to Breit's Petition to Determine Parentage on December 15, 2010.  Mother and L.F. asserted that, pursuant to Code §§ 20-158(A)(3) and 32.1-257(D), Breit was barred from receiving the relief he requested in the Petition to Determine Parentage because Breit and mother had never been

---

(Emphasis added).  The parentage of L.F. "[was] at issue . . . before the [trial] court" because Breit had appealed the JDR district court's dismissal of his petition for custody and visitation to the trial court.  Code § 20-49.2.

[9] Code § 20-49.1(B)(2) provides, in pertinent part:

> The parent and child relationship between a child and a man may be established by . . . [a] voluntary written statement of the father and mother made under oath acknowledging paternity . . . . A written statement shall have the same legal effect as a judgment entered pursuant to [Code] § 20-49.8 and shall be binding and conclusive unless, in a subsequent judicial proceeding, the person challenging the statement establishes that the statement resulted from fraud, duress or a material mistake of fact.

[10] On November 16, 2010, the chief judge of the trial court entered an order disqualifying all of the judges of the trial court from hearing Breit's appeal from the JDR district court.  The judges of the trial court recused themselves because Breit was "an attorney who practice[d] regularly before [the trial court] and [was] well-known by the judges."  The Supreme Court of Virginia thereafter appointed a retired circuit court judge to hear the appeal from the JDR district court.

[11] Mother employed Weinberg to represent L.F.'s interests in this matter.

- 6 -

married and L.F. was conceived through assisted conception. At the hearing in the trial court on December 20, 2010, the trial court, over Breit's objection, appointed Jerrold Weinberg, the attorney previously retained for L.F. by mother, to be L.F.'s guardian *ad litem*, sustained the pleas in bar to Breit's Petition to Determine Parentage, and dismissed Breit's petitions for custody, visitation, and summary judgment. The trial court stated:

> I'm of the opinion that the pleas in bar should be sustained. I think frankly if I were to construe this the way that [Breit] asks, and there's a strong argument for that, but if you do it seems to me that [Code §§] 20-158(A) and [20-164][12] and so forth would be trumped and could be made to be fairly meaningless, and I don't think that's a proper way to construe statutes. I think you have to construe them so that they . . . are in harmony with each other.

(Footnote added).

On January 28, 2011, the trial court entered a final order ("order") sustaining L.F.'s and mother's pleas in bar to Breit's Petition to Determine Parentage, denied his Motion for Summary Judgment and Motion for Genetic Testing, and dismissed without prejudice the portion of relief sought by him in his Petition to Determine Parentage to award him custody and visitation with L.F. as a person with a legitimate interest. On February 2, 2011, Breit filed a motion to rehear in the trial court, which was scheduled for argument on March 9, 2011. Prior to the scheduled date on his motion to rehear, Breit timely filed a notice of appeal with this Court seeking review of the trial court's order denying his Petition to Determine Parentage of L.F. The trial court

---

[12] Code § 20-164 provides, in pertinent part, that "[a] child whose status as a child is declared or negated by this chapter [Status of Children of Assisted Conception] is the child only of his parent or parents as determined under this chapter, Title 64.1, and, when applicable, Chapter 3.1 ([Code] § 20-49.1 *et seq.*) of this title for all purposes."

thereafter entered an order denying Breit's motion to rehear and canceled the hearing previously set for March 9, 2011.[13]

## II. ANALYSIS

In this appeal, we consider whether the trial court—in a paternity action filed by a known sperm donor, who was acknowledged under oath by the biological and gestational mother, to whom the donor was never married, to be the biological father of the child at issue—erred in sustaining pleas in bar to the sperm donor's petition to determine parentage of the child conceived as a result of assisted conception.

Following a hearing on mother's plea in bar, the trial court found that Code § 20-158(A)(3) barred Breit from establishing parentage of L.F. pursuant to Code § 20-49.2, notwithstanding the voluntary Acknowledgment of Paternity executed under oath by mother and Breit pursuant to Code § 20-49.1(B)(2). Whether Code § 20-158(A)(3) prohibits a parentage action by a known sperm donor, who was not married to the child's mother at conception or at the time of the child's birth, and who executed an Acknowledgment of Paternity under oath jointly with the mother pursuant to Code § 20-49.1(B)(2), is a matter of first impression before this Court. Because this case presents "a question of law . . . involv[ing] the interpretation and application" of these statutes, "we review the trial court's judgment *de novo*." Colbert v. Commonwealth, 47 Va. App. 390, 394, 624 S.E.2d 108, 110 (2006).

### A. Code §§ 20-49.1(B)(2) and 20-158(A)(3)

Code § 20-49.2 provides that, "upon petition, verified by oath or affirmation, . . . a child, a parent, a person claiming parentage, a person standing *in loco parentis* to the child or having

---

[13] The trial court set forth the basis of its ruling in an opinion letter to the parties dated February 18, 2011. On April 6, 2011, the trial court entered an order denying Breit's motion to rehear.

legal custody of the child or a representative of the Department of Social Services or the Department of Juvenile Justice" may commence an action under Title 20, Chapter 3.1, an Act related to Proceedings to Determine Parentage, to determine parentage of the child. Code § 20-49.2 provides that "[t]he determination of parentage, when raised in any proceeding, shall be governed by [Title 20, Chapter 3.1, Code §§ 20-49.1 to -49.10]."

Code § 20-49.1(B)(2) provides, in pertinent part:

> The parent and child relationship between a child and a man may be established by . . . [a] *voluntary written statement of the father and mother made under oath acknowledging paternity* . . . . The acknowledgement may be rescinded by either party within sixty days from the date on which it was signed . . . . A written statement shall have the same legal effect as a judgment entered pursuant to [Code] § 20-49.8 and shall be binding and conclusive unless, in a subsequent judicial proceeding, the person challenging the statement establishes that the statement resulted from fraud, duress or a material mistake of fact.

(Emphasis added). Neither mother nor Breit rescinded the Acknowledgment of Paternity within sixty days of signing it, and neither party asserted that the Acknowledgment of Paternity resulted from fraud, duress, or a material mistake of fact.

Title 20, Chapter 9, Code §§ 20-156 to -165, an Act related to the Status of Children of Assisted Conception,[14] provides that, in determining the parentage of a child conceived through assisted conception, "[a] donor is not the parent of a child conceived through assisted conception, unless the donor is the husband of the gestational mother." Code § 20-158(A)(3).

---

[14] The General Assembly adopted the Act at the next legislative session following the decision in Welborn v. Doe, 10 Va. App. 631, 634-35, 394 S.E.2d 732, 733-34 (1990), in which the Court held it was compelled to conclude that although the husband of a woman who underwent artificial insemination with the sperm of an anonymous third-party donor was the father of the resulting children for purposes of legitimacy, inheritance, and the children's birth certificates, the parental rights of the sperm donor could be legally terminated only through adoption.

Mother asserts that Code § 20-158(A)(3) imposes an absolute legal bar to Breit's ability to assert parentage of the child. As a result, she contends the Acknowledgment of Paternity executed by the parties pursuant to Code § 20-49.1(B)(2) is void *ab initio* as being contrary to the General Assembly's express intent to divest all sperm donors of any parental rights and responsibilities for children born as a result of assisted conception, even where, as here, the mother and donor acknowledged under oath and obtained a birth certificate acknowledging that the donor was the biological father of the child.

Breit contends that Code §§ 20-49.1(B)(2) and 20-158(A)(3) must be construed together to effectuate the legislative intent of each statute and that Code § 20-158(A)(3) does not operate as a permanent bar to his ability to establish parentage of the child under the circumstances presented in these proceedings. See City of Lynchburg v. English Constr. Co., 277 Va. 574, 584, 675 S.E.2d 197, 202 (2009) ("It is the duty of the courts to construe statutory enactments so as to avoid repugnance and conflict between them and, if possible, to give force and effect to each of them."). Breit asserts the primary purpose of the assisted conception statutes, Code §§ 20-156 to -165, is to assist infertile married couples in effectuating surrogacy contracts with sperm and egg donors or gestational surrogates; assign parental rights and responsibilities to the intended parents, that is, the infertile married couple; and to divest donors, generally anonymous, of legal rights and responsibilities for any resulting children. Breit contends that the General Assembly, in enacting Code § 20-158(A)(3), did not intend to divest known sperm donors of the ability to establish parentage of children born as a result of assisted conception where, as here, the gestational and biological mother and sperm donor were known to each other, lived together as an unmarried couple, voluntarily engaged in sexual intercourse for the purpose of conceiving a child, voluntarily executed an Acknowledgment of Paternity pursuant to Code § 20-49.1(B)(2) identifying the donor as the father of the child, named the donor as the child's father on the

child's birth certificate, and jointly represented to friends and family that the donor was the father of the child.

Under settled principles of statutory construction, related statutes must be construed "together in order to give full meaning, force, and effect to each." Antisdel v. Ashby, 279 Va. 42, 48, 688 S.E.2d 163, 166 (2010). We interpret like statutes in accord to "'make the scheme consistent in all its parts and uniform in its operation, unless a different purpose is shown plainly or with irresistible clearness.'" Alston v. Commonwealth, 274 Va. 759, 769, 652 S.E.2d 456, 462 (2007) (quoting Prillman v. Commonwealth, 199 Va. 401, 405, 100 S.E.2d 4, 7 (1957)). We presume the General Assembly did not intend to enact a "manifest absurdity," and we interpret statutes to avoid such an inconsonant result. Conyers v. Martial Arts World of Richmond, Inc., 273 Va. 96, 104, 639 S.E.2d 174, 178 (2007). In addition, "[i]f a statute is subject to more than one interpretation, we must apply the interpretation that will carry out the legislative intent behind the statute." Id.

Code §§ 20-158(A)(3) and 20-49.1(B)(2) clearly relate to the same subject matter, that is, establishing legal parentage of children. Though in separate and distinct chapters of Title 20, each statute has the same basic objective, namely, to confer the rights and responsibilities of parentage upon the intended mother and father. We conclude that under settled rules of statutory construction, Code § 20-158(A)(3) must be read in conjunction with Code § 20-49.1(B)(2). See Andrews v. Creacey, 56 Va. App. 606, 617, 696 S.E.2d 218, 223 (2010) ("'Statutes which have the same general or common purpose or are parts of the same general plan are . . . ordinarily considered as *in pari materia*.'" (quoting Lucy v. County of Albemarle, 258 Va. 118, 129, 516 S.E.2d 480, 485 (1999))); Commonwealth v. Fairfax County Sch. Bd., 49 Va. App. 797, 803-04, 645 S.E.2d 337, 340 (2007) ("Under the rules of statutory construction, closely related statutes must be read as being consistent with one another.").

Reading together Code §§ 20-49.1(B)(2) and 20-158(A)(3), each of which has as its primary purpose ensuring legal parentage of a child by a known mother and known father, we conclude the General Assembly did not intend to permanently bar a parentage action by a sperm donor under the factual circumstances presented in the record on appeal, including the voluntary acknowledgment of parenthood under oath by the undisputed biological mother and biological father pursuant to Code § 20-49.1(B)(2), solely because the mother and sperm donor were unmarried at the time of conception. Such a narrow reading of the assisted conception statutes fails to accord harmony with --and indeed all but negates-- the ability of a known biological father, chosen by the birth mother, to establish parentage pursuant to Code § 20-49.1(B)(2). Interpreting Code § 20-158(A)(3), under the circumstances presented in this record, to impose a permanent bar to a known biological father's petition to determine parentage pursuant to Code § 20-49.2—a biological father whose sperm was donated for *in vitro* fertilization at the request and with the consent of the birth mother who voluntarily signed a birth certificate application under oath acknowledging the biological father to be the legal father of the child—results in a manifest absurdity because the intended, biological father of the child could *never* establish parentage of the child. See Appellee's Br. at 6 (Code § 20-158(A)(3) "*fully and finally terminate[s] any potential parentage rights* of sperm donors" (emphasis added)). Mother's interpretation of Code § 20-158(A)(3) forecloses *any* legal means for an intended, unmarried, biological father to establish legal parentage of a child born as the result of assisted conception, merely by virtue of his immutable status as a "donor." Such a narrow reading of Code § 20-158(A)(3) ignores the intent of the legislature to ensure that all children born in the Commonwealth have a known legal mother and legal father. See, e.g., Commonwealth *ex rel.* Gray v. Johnson, 7 Va. App. 614, 622, 376 S.E.2d 787, 791 (1989) ("[T]he establishment of the parent-child relationship is the most fundamental right the child possesses to be equated in

importance with personal liberty and the most basic constitutional rights." (quoting Ruddock v. Ohls, 154 Cal. Rptr. 87, 91 (Cal. Ct. App. 1979))).

We "will not add words to [Code §§ 20-156 to -165] that would expand the scope of the statute[s]." Seguin v. Northrop Grumman Sys. Corp., 277 Va. 244, 248, 672 S.E.2d 877, 879 (2009). We do not read Code §§ 20-156 to -165, which are primarily concerned with ensuring that infertile married couples will not be threatened by parentage claims from anonymous sperm and egg donors, to mandate that a chosen, unmarried sperm donor, known by the unmarried gestational mother and intended by the gestational mother to be the father of the resulting child, may never be legally recognized as the parent, and must be permanently barred from assuming parental rights and responsibilities, simply because he was not married to the mother at the time the child was conceived by voluntary assisted conception.

From the undisputed factual record presented on appeal, we conclude that a known sperm donor who, at the request of a woman to whom he is not married, donates his sperm for the purpose of uniting that sperm with that woman's egg to accomplish pregnancy through assisted conception and who, together with the biological mother, executes an uncontested Acknowledgment of Paternity under oath, pursuant to Code § 20-49.1(B)(2), is not barred from filing a parentage action pursuant to Code § 20-49.2 to establish paternity of the child resulting from assisted conception. Accordingly, we reverse the holding of the trial court sustaining appellees' pleas in bar to Breit's Petition to Determine Parentage, and remand for further proceedings.[15]

---

[15] Mother asserts that Code § 32.1-257(D), related to vital records and the filing of birth certificates, also imposes an absolute legal bar to Breit's ability to assert parentage of L.F. We disagree. Code § 32.1-257(D) provides, in pertinent part:

> If the mother of a child is not married to the natural father of the child at the time of birth or was not married to the natural

B. Guardian *ad litem*

Breit also contends the trial court abused its discretion in appointing attorney Jerrold G. Weinberg ("Weinberg") as the child's guardian *ad litem* ("GAL"), asserting that Weinberg was not qualified to act as GAL pursuant to Code §§ 16.1-266 and 8.01-9,[16] failed to make any

> father at any time during the ten months next preceding such birth, the name of the father shall not be entered on the certificate of birth *without a sworn acknowledgment of paternity*, *executed subsequent to the birth of the child*, *of both the mother and of the person to be named as the father*.
>
> > \*   \*   \*   \*   \*   \*   \*
>
> For the purpose of birth registration in the case of a child resulting from assisted conception, pursuant to Chapter 9 ([Code] § 20-156 *et seq*.) of Title 20, the birth certificate of such child shall contain full information concerning the mother's husband as the father of the child and the gestational mother as the mother of the child. Donors of sperm or ova shall not have any parental rights or duties for any such child.

(Emphasis added). The purpose of Code § 32.1-257(D), as it relates to children resulting from assisted conception involving an *anonymous sperm or egg donor*, is to ensure that the Commonwealth's vital records accurately reflect the intended parent-child relationship. Code § 32.1-257(D) ensures that the intended parents, that is, the infertile married couple, are named as the legal mother and father of the child born as a result of assisted conception and that the sperm or egg donors, who are the biological but not the intended parents of the resulting child, are not named as the legal parents on the child's birth certificate. Where, as here, the unmarried biological parents together undertake the process of assisted conception, using their respective donated sperm and egg, voluntarily execute an Acknowledgment of Paternity under oath naming the biological father as the legal father of the resulting child, cohabitate before, during, and after the mother's pregnancy, give the child a hyphenated surname of the biological parents on the affidavit for the birth certificate, and together represent to family and friends that the biological father is the legal father of the child, Code § 32.1-257(D) provides that the name of the father "shall . . . be entered on the certificate of birth."

[16] Code §§ 16.1-266 and 8.01-9 delineate under what circumstances the trial court must appoint a GAL. The Standards to Govern the Performance of Guardians *ad litem* for Children, available at http://www.courts.state.va.us/courtadmin/aoc/cip/programs/gal/children/gal_performance_standards_children.pdf, adopted by the Judicial Council of Virginia and approved by the Supreme Court of Virginia in 2003, establish the specific duties and qualifications of GALs appointed by the Virginia courts.

inquiry with Breit about his relationship with L.F., and had a clear conflict of interest in acting as the child's GAL. Mother asserts that Code §§ 16.1-266 and 8.01-9 expressly provide that the trial court may appoint the child's attorney as GAL and that nothing in the common law or Rules of Professional Conduct prohibits an attorney from representing a client while being paid by a third party.

Code § 8.01-9 provides, *inter alia*, that it is the duty of the GAL to "faithfully represent . . . the interest of the [child] for whom he is appointed" and that it is the duty of the trial court to ensure the GAL faithfully represents and protects the interests of that child. "Whenever the court is of the opinion that the interest of the [child] so requires, it shall remove any [GAL] and appoint another in his stead." Code § 8.01-9.

At the December 20, 2010 hearing, before appointing Weinberg as L.F.'s GAL, the trial court admonished the parties that "somebody should be here representing [L.F.] separate and apart from either of the other parties" and that any appointed GAL must represent the best interest of L.F. "independent of either parent." The trial court noted that mother, not Breit, had hired and paid Weinberg to act as L.F.'s attorney. The trial court also stated that only "an incredibly unusual person" can be "independent when [he] [is] being paid by one of the parties," and surmised that one "[cannot] serve two masters." Breit's counsel told the trial court that Weinberg had not interviewed Breit or any other witnesses and, by taking an identical position as mother in response to Breit's Petition to Determine Parentage, was "representing [to the trial court] that this is the best interest of [L.F.] without any investigation of" Breit. The trial court then asked and received confirmation from Weinberg that he was retained by mother to be the child's attorney. Without further colloquy or explanation, and notwithstanding its prior remarks, the trial court then appointed Weinberg to act as L.F.'s GAL and ordered that mother and Breit share the cost of Weinberg's GAL fees.

From the record before us, we conclude that the trial court abused its discretion in appointing Weinberg to act as the child's GAL. The role of the GAL "when representing an infant [is] to defend a suit on behalf of the infant earnestly and vigorously and not merely in a perfunctory manner." Norfolk Div. of Soc. Servs. v. Unknown Father, 2 Va. App. 420, 425 n.5, 345 S.E.2d 533, 536 n.5 (1986). It is axiomatic that the GAL's investigation of the facts must be independent of any other party's interests in the outcome of the litigation. See, e.g., Bottoms v. Bottoms, 249 Va. 410, 420, 457 S.E.2d 102, 108 (1995) (GAL must serve as an "independent participant" in the trial court on behalf of the child); Standards to Govern the Performance of Guardians *ad litem* for Children, supra note 16 (noting a GAL must, *inter alia*, conduct an independent investigation to ascertain the facts of the case and provide the trial court sufficient information based on the findings of the GAL's independent investigation).

The record on appeal contains no indication that the trial court made any inquiry of Weinberg whether his duty to represent L.F.'s best interest as GAL was compromised by his pre-existing legal relationship with and financial dependence on mother. Given the existence of uncontradicted allegations in the record tending to implicate such concerns, we conclude the trial court erred in appointing Weinberg as the child's GAL and direct the trial court to appoint a new GAL for L.F. on remand.

### C. Attorney's Fees

Breit also asserts the trial court erred in failing to award his attorney's fees at trial. Because Breit failed to present this argument to the trial court, we will not consider it for the first time on appeal. See Rule 5A:18 ("No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable the Court of Appeals to attain the ends of justice."). Breit does not argue that we should invoke either the good cause or ends of justice exceptions to

Rule 5A:18, and we will not consider Rule 5A:18 exceptions *sua sponte*. Edwards v.

Commonwealth, 41 Va. App. 752, 761, 589 S.E.2d 444, 448 (2003) (*en banc*).[17]

### III.  CONCLUSION

For these reasons, we affirm in part, reverse in part, and remand this case to the trial court

for further proceedings consistent with this opinion.

Affirmed in part,
reversed in part,
and remanded.

---

[17] In his brief on appeal, Breit asks for an award of attorney's fees and costs associated with his appeal.  This case is one of first impression before this Court.  Although Breit substantially prevailed on appeal, mother's arguments on appeal were not so frivolous as to justify an award of fees and costs.  See O'Loughlin v. O'Loughlin, 23 Va. App. 690, 695, 479 S.E.2d 98, 100 (1996) (when determining the "propriety of an award of attorney's fees for efforts expended on appeal," we "view the record in its entirety and determine whether the appeal is frivolous or whether other reasons exist for requiring additional payment").  We decline to award attorney's fees and costs under these circumstances.